# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**HARD ROCK CAFÉ INTERNATIONAL
(USA), INC.**, a Florida corporation,

     Plaintiff,

vs.

**CASE NO:**

6:01-cv-790 ORL-18 DAB

**SUNRISE IDENTITY, INC.**, a Washington
corporation, f/k/a **SUNRISE CLOTHING
GROUP**,

     Defendant.

_____/

## COMPLAINT

Plaintiff, HARD ROCK CAFÉ INTERNATIONAL (USA), INC., a Florida

corporation, sues Defendant, SUNRISE IDENTITY, INC. f/k/a SUNRISE

CLOTHING GROUP, a Washington corporation, and alleges:

### Parties

1.    Plaintiff, HARD ROCK CAFÉ INTERNATIONAL (USA), INC.

("HARD ROCK CAFÉ"), is a corporation duly organized under the laws of the

State of Florida and maintains its principal place of business at 6100 Old Park

Lane, Orlando, Florida 32835.

2.    Defendant, SUNRISE IDENTITY, INC. f/k/a SUNRISE

CLOTHING GROUP ("SUNRISE"), is a corporation organized under the laws of

the State of Washington with its principal place of business at 14051 Northeast 200th Street, Woodinville, Washington 98072.

## Jurisdiction and Venue

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) insofar as the matter in controversy exceeds the sum of value of $75,000, exclusive of interest and costs, and is between citizens of different States within the meaning of 28 U.S.C. § 1332(c)(1).

4.     This Court has personal jurisdiction over SUNRISE by virtue of its voluntary consent to this Court's jurisdiction in paragraph 13(g) of the Memorandum of Understanding between the parties dated June 9, 2000 and attached as Exhibit "A".  Further, SUNRISE is subject to the personal jurisdiction of this Court pursuant to the Florida Long Arm Statute, Fla. Stat. § 48.193 (2001).  In this regard, at all times relevant, SUNRISE has continuously and regularly engaged in substantial and not isolated business activities within the State of Florida.  Moreover, SUNRISE is subject to the personal jurisdiction of this Court pursuant to Fla. Stat. § 48.193(g) by breaching a contract within this State by failing to perform acts required by the contract to be performed within the State.

5.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) & (c) and in this Division pursuant to Local Rule 1.02, M.D. Fla. Local

Rules.

## General Allegations

6.      HARD ROCK CAFÉ's predecessor-in-interest opened the first HARD ROCK CAFÉ in London, England on June 14, 1971.  Since that time, HARD ROCK CAFÉ, its affiliates, franchisees and predecessors-in-interest have opened and now maintained over one hundred four (104) HARD ROCK CAFÉ Restaurants throughout the world.  Presently, there are four (4) HARD ROCK CAFÉs located in the State of Florida, including one located within this District.

7.      Since June 14, 1991, HARD ROCK CAFÉ, its predecessors-in-interest, affiliates and franchisees, have operated HARD ROCK CAFÉ Restaurants using its distinctive trading style.  HARD ROCK CAFÉ scrupulously maintains the standards and style of the original restaurant in London and the other HARD ROCK CAFÉ Restaurants around the world and chooses to present to the public of the world, a unified, consistent image.

8.      HARD ROCK CAFÉ Restaurants are decorated in a similar American-style period while music is played and the walls are decorated with music memorabilia.  The local culture in each location may be incorporated into each HARD ROCK CAFÉ Restaurant through the use of local artists' memorabilia.  The service is fast and to a very high standard.  Good quality American cuisine is served, and in some instances, local culture is also

incorporated into the menu.  Popular entrees include hamburgers, barbeques, sandwiches and steaks.

9.      Merchandising is of particular importance at HARD ROCK CAFÉ Restaurants and a substantial source of income.  HARD ROCK CAFÉ, its affiliates and predecessors-in-interest have been selling a substantial range of merchandise all bearing the HARD ROCK CAFÉ trademark since the mid 1970s, including sweatshirts, jackets, bags, hats, watches, sunglasses, non-precious metal jewelry, key chains, toys and pens, and most particularly, t-shirts which have achieved a unique cult-like aura and popularity.

10.     As part of its integral business of merchandising, HARD ROCK CAFÉ contracts with various vendors to provide licensed merchandise bearing the distinctive HARD ROCK CAFÉ trademark for sale by HARD ROCK CAFÉ, its affiliates and franchisees.

11.     For the past few years, HARD ROCK CAFÉ has had a contractual relationship with SUNRISE whereby SUNRISE agreed to manufacture licensed merchandise bearing the HARD ROCK CAFÉ trademark pursuant to HARD ROCK CAFÉ's specifications and high quality standards. Pursuant to this relationship, HARD ROCK CAFÉ and SUNRISE entered into a series of written agreements memorializing the term of this relationship.  Included among these written agreements are a Memorandum of Understanding ("MOU") dated June

9, 2000 and attached as Exhibit "A"; a Hold Harmless Agreement and Guaranty/Warranty of Product ("Hold Harmless Agreement") dated June 9, 2000 and attached as Exhibit "B"; a HARD ROCK CAFÉ Purchase Order Terms dated June 9, 2000 and attached as Exhibit "C"; and a Purchase Order Terms and Conditions Agreement ("PO Terms and Conditions") dated June 9, 2000 and attached as Exhibit "D". Collectively, these written agreements are referred to hereinafter as the "Written Agreements" and represent the parties' express understanding regarding their business relationship.

12.     On or about December 29, 1999, HARD ROCK CAFÉ placed two orders with SUNRISE for the manufacture and delivery of 96,840 dyed green t-shirts (the "Merchandise") bearing the HARD ROCK CAFÉ trademark and logo at a purchase price of $5.66 per unit for a total purchase price of $548,114. Copies of HARD ROCK CAFÉ's Purchase Order Nos. SSD-000923 and GM-00922 are attached as Exhibits "E" & "F". Pursuant to the terms of the Purchase Orders, SUNRISE was required to deliver these specially manufactured green dyed t-shirts to HARD ROCK CAFÉ's various stores and franchisees between April 15, 2000 and May 1, 2000.

13.     In accordance with the Purchase Orders attached as Exhibits "E" & "F", SUNRISE shipped to HARD ROCK CAFÉ's stores and franchisees approximately 96,840 green dyed t-shirts bearing the HARD ROCK CAFÉ

trademark and logo in late April, 2000.  In turn, HARD ROCK CAFÉ promptly and timely paid SUNRISE in full for this merchandise.

14.     Almost immediately, HARD ROCK CAFÉ, its affiliates and franchisees began to receive customer complaints regarding this Merchandise. Specifically, numerous HARD ROCK CAFÉ customers complained of and/or returned the merchandise due to a streaking problem in which the subject merchandise became discolored after an initial washing of the merchandise.

15.     By June 21, 2000, SUNRISE acknowledged the existence of a streaking defect with the merchandise and began internal testing to determine the cause and scope of the defect.  Simultaneously, HARD ROCK CAFÉ, its affiliates and franchisees removed the merchandise from its sales inventory to avoid any other dissatisfied customers.

16.     In mid July, 2000, SUNRISE advised that its testing had determined that the green dye did not properly bind to some of the fabric due to an excessive amount of bleach used in SUNRISE's finishing process. However, SUNRISE believed that this defect was limited to a small percentage of the total merchandise shipped.  Further, SUNRISE believed that the defective merchandise was shipped predominantly to HARD ROCK CAFÉ's Orlando and Washington D.C. stores.

17.     Contrary to SUNRISE's belief however, HARD ROCK CAFÉ had

received complaints and returns of the defective merchandise from over a dozen stores throughout the HARD ROCK CAFÉ system. Accordingly, the parties agreed that HARD ROCK CAFÉ would return the remaining inventory of the Merchandise to SUNRISE for additional testing and quality control. Depending on the outcome of this testing and quality control, HARD ROCK CAFÉ reserved the right to either have SUNRISE reship the non-defective Merchandise after testing in the spring of 2001 (the beginning of HARD ROCK CAFÉ's selling season) or reject these goods outright in accordance with Written Agreements.

18.     In August 2000, HARD ROCK CAFÉ returned 75,666 t-shirts to SUNRISE for testing and additional quality control. The original purchase price of these returned t-shirts was $428,269.56.

19.     In mid September 2000, SUNRISE advised that it had rewashed all of the returned Merchandise and subjected each unit to quality control. This rewashing and quality control testing, according to SUNRISE, resulted in a determination that approximately seven percent (7%) of the inventory was defective.

20.     Following this rewashing and testing, in September 2000, SUNRISE provided HARD ROCK CAFÉ with approximately one dozen t-shirts of the rewashed and supposedly non-defective Merchandise for its inspection

and review. HARD ROCK CAFÉ, in turn, washed these dozen supposedly non-defective t-shirts only to discover that, in each instance, the t-shirts exhibited the same streaking/discoloration defect.

21.     Accordingly, on September 22, 2000, HARD ROCK CAFÉ advised SUNRISE that it would not accept shipment of any of the Merchandise, as to do so would severely risk the reputation and goodwill of HARD ROCK CAFÉ with its customers. At that time, HARD ROCK CAFÉ was willing to consider accepting a credit for the returned Merchandise on future purchases.

22.     In December 2000, SUNRISE again requested that HARD ROCK CAFÉ reconsider and accept the rewashed and supposedly non-defective Merchandise. HARD ROCK CAFÉ declined.

23.     On April 18, 2001, HARD ROCK CAFÉ demanded that SUNRISE destroy the returned Merchandise in accordance with the Written Agreements and refund the purchase price of $428,269.56.

24.     On May 7, 2001, SUNRISE refused to destroy the Merchandise or reimburse HARD ROCK CAFÉ's purchase price for the Merchandise.

25.     As a result of the actions of SUNRISE, HARD ROCK CAFÉ has been injured insofar as SUNRISE has wrongfully benefited from retaining $428,269.56 since May 2000; HARD ROCK CAFÉ has been deprived of the profits it should have garnered from the sale of conforming, non-defective

Merchandise during its spring and summer 2000 prime sales period; and suffered additional damages to its goodwill and reputation resulting from HARD ROCK CAFÉ's inadvertent sale of defective Merchandise to its customers.

## COUNT I

### Breach of Written Agreements

26.     HARD ROCK CAFÉ incorporates and realleges by reference the allegations contained in paragraphs 1 through 25.

27.     As part of the MOU, HARD ROCK CAFÉ and SUNRISE agreed:

(a)     "If any such Merchandise is defective or does not comply with [Hard Rock Café's] specifications, then unless such Merchandise is altered by [Sunrise] so as to correct such deficiencies and comply with such specifications, [Sunrise] agrees that [Sunrise] will destroy such Merchandise containing the Licensed Material at no cost to [Hard Rock Café] or its authorized Purchaser";

(b)     "... should there be excess quantities of any Merchandise due to defects ..., [Sunrise] shall, according to [Hard Rock Café's] instructions, destroy or deface such excess Merchandise and deliver to [Hard Rock Café] evidence of such destruction or defacement that is satisfactory to [Hard Rock Café]. ...";

(c)     "[Sunrise] agrees to abide by any and all quality compliance testing programs promulgated by [Hard Rock Café] relating to the quality and

specifications of the Merchandise, at [Sunrise's] sole cost and expense. [Sunrise] agrees to provide samples of Merchandise for testing under [Hard Rock Café's] compliance programs. ... [Hard Rock Café] shall have the right to return, and shall not be liable for the cost, of any Merchandise delivered by [Sunrise], which does not meet the requirements or specifications of this compliance program.";

(d)    "[Sunrise] warrants that the Merchandise manufactured by [Sunrise] shall be free from defects in material and workmanship and shall be of the kind and quality specified or designated by [Hard Rock Café].

28.    As part of the Hold Harmless Agreement attached as Exhibit "B", HARD ROCK CAFÉ and SUNRISE agreed that "[t]he articles contained in any shipment or delivery made by [Sunrise] ... made to or on the order of [Hard Rock Café] ... is hereby guaranteed, as of the date of such shipment or delivery, ... to be in compliance with all applicable Federal, State and Local laws.

29.    As part of the PO Terms and Conditions attached as Exhibit "D", HARD ROCK CAFÉ and SUNRISE agreed as follows:

(a)    [Sunrise] represents and warrants to [Hard Rock Café], in addition to all warranties implied by law, that the Merchandise ... shall:

(i)    "Be free from defects and design, workmanship or materials, including, without limitation, such defects as could create a hazard to life or property";

(ii)     "Be suitable for end use"; ...

(iii)    "Conform to all specifications and other descriptions set forth or incorporated herein, and to all articles accepted by [Hard Rock Café] as Merchandise samples ...";

(iv)    "The Merchandise shall be subject to inspection by [Hard Rock Café] ... upon the premises of [Sunrise] or Factory of origin. ... Notwithstanding any inspection at [Sunrise's] premises of the Merchandise, [Hard Rock Café] shall have the right to inspect the Merchandise at [Hard Rock Café's] premises prior to acceptance and payment";

(v)     "[Hard Rock Café] shall have the right to refuse Merchandise not in accordance with Specifications or industry standard, or which is different in quality or quantity from that ordered... [Hard Rock Café] may, at its sole discretion, either return rejected Merchandise or hold same at [Sunrise's] risk and expense and may, in either event, charge [Sunrise] with the cost of transportation, shipping, unpacking, examining, repacking, storing, reshipping and other like expenses. ...;

(vi)    Acceptance of any prior shipments contrary to the Order shall not be considered a waiver of [Hard Rock Café's] right to return any or all of the Merchandise and receive full credit therefore;

(vii)   Any claims for defective Merchandise, shortages, returns, damages or other claims asserted as a result of [Sunrise's] failure to comply with these Terms and Conditions made by [Hard Rock Café] will be charged back to [Sunrise] and the amount thereof deducted from payments to be made to [Sunrise] or, alternatively, will be promptly refunded to [Hard Rock Café].";

(viii)   "[Hard Rock Café] may at any time after delivery of the Merchandise (and whether or not the same has been accepted by [Hard Rock Café]) return all or part of the Merchandise if any portion is found to be in a damaged or defective condition, and [Sunrise] shall refund to [Hard Rock Café] in full the price paid by [Hard Rock Café] for such returned Merchandise."

30.   HARD ROCK CAFÉ has performed all conditions precedent to the Written Agreements.

31.   SUNRISE has materially breached the Written Agreements including specifically the MOU, Hold Harmless Agreement and PO Terms and Conditions as follows:

(a)   By delivering defective Merchandise;

(b)   By delivery of Merchandise that is defective in material and workmanship;

(c)     By delivering Merchandise that is not of the kind and quality specified designated by HARD ROCK CAFÉ;

(d)     By delivering Merchandise which does not meet the requirements or specifications of HARD ROCK CAFÉ's quality compliance testing programs;

(e)     By delivering Merchandise which is unsuitable for its intended end use;

(f)     By delivering Merchandise which does not conform to HARD ROCK CAFÉ's specifications and other descriptions;

(g)     By failing to refund to HARD ROCK CAFÉ $428,269.56 paid by HARD ROCK CAFÉ to SUNRISE for the defective merchandise;

(h)     By failing to destroy the defective Merchandise upon demand by HARD ROCK CAFÉ.

32.     HARD ROCK CAFÉ has been damaged by SUNRISE's material breaches of the Written Agreements insofar as SUNRISE has wrongfully retained $428,269.56 since May 2000 for the defective Merchandise, HARD ROCK CAFÉ has suffered lost profits from being unable to sell conforming and non-defective merchandise during its spring and summer 2000 selling season and HARD ROCK CAFÉ has suffered damages in the form of diminished goodwill and reputation due to the sale of defective merchandise manufactured by SUNRISE.

33.    HARD ROCK CAFÉ has retained the law firm of Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. in this action and is obligated to pay said firm a reasonable attorneys' fee.

## COUNT II

### Breach of Implied Warranty – Rightful Rejection

34.    HARD ROCK CAFÉ incorporates and realleges by reference the allegations contained in paragraphs 1 through 33.

35.    The Merchandise delivered to HARD ROCK CAFÉ by SUNRISE pursuant to the Purchase Orders attached as Exhibits "E" & "F" are not merchantable within the meaning of Fla. Stat. § 672.314(2) (2001) and, thus, violate the implied warranty of merchantability.

36.    At the time that SUNRISE accepted HARD ROCK CAFÉ's Purchase Orders attached as Exhibit "E" & "F", SUNRISE had reason to know of the particular purpose for which the Merchandise is required and that HARD ROCK CAFÉ was relying on SUNRISE's skill or judgment to select or furnish suitable Merchandise.

37.    The Merchandise delivered by SUNRISE to HARD ROCK CAFÉ under the Purchase Orders attached as Exhibits "E" & "F" violated the implied warranty of fitness for a particular purpose under Fla. Stat. § 672.315 (2001).

38.    HARD ROCK CAFÉ rightfully rejected the defective Merchandise

delivered by SUNRISE under Fla. Stat. § 672.602 (2001).

39.    As a result of SUNRISE's breach of the implied warranties of merchantability and fitness for a particular purpose, HARD ROCK CAFÉ had the right to reject all of the defective Merchandise pursuant to Fla. Stat. § 672.601.

40.    Under Fla. Stat. § 672.711(1), HARD ROCK CAFÉ is entitled to recover its purchase price for the rejected, defective Merchandise in the amount of $428,269.56 along with prejudgment interest.   Additionally, HARD ROCK CAFÉ is entitled to recover its damages in the form of lost profits under Fla. Stat. § 672.713 (2001) and its incidental and consequential damages under Fla. Stat. § 672.715 (2001).

### COUNT III

### Breach of Implied Warranty – Revocation of Acceptance

41.    HARD ROCK CAFÉ incorporates and realleges by reference the allegations contained in paragraphs 1 through 40.

42.    To the extent that HARD ROCK CAFÉ is deemed to have accepted any or all of the Merchandise delivered by SUNRISE under the Purchase Orders attached as Exhibits "E" & "F", HARD ROCK CAFÉ was entitled to revoke its acceptance of the defective Merchandise under Fla. Stat. § 672.608 (2001) insofar as the non-conformity substantially impairs the value of

the Merchandise to HARD ROCK CAFÉ and HARD ROCK CAFÉ accepted said Merchandise without discovery of such non-conformity since HARD ROCK CAFÉ'S acceptance was reasonably induced by the difficulty of discovery of the non-conformity before acceptance.

43.     HARD ROCK CAFÉ notified SUNRISE within a reasonable time of its revocation of acceptance of the non-conforming Merchandise.

44.     Under Fla. Stat. § 672.711(1), HARD ROCK CAFÉ is entitled to recover the purchase price of the non-conforming Merchandise in the amount of $428,269.56 plus prejudgment interest along with its lost profits under Fla. Stat. § 672.713 (2001) and HARD ROCK CAFÉ's incidental and consequential damages under Fla. Stat. § 672.715 (2001).

WHEREFORE, HARD ROCK CAFÉ respectfully requests that this Court enter judgment in its favor and against SUNRISE as follows:

A.     Awarding HARD ROCK CAFÉ the purchase price of the defective and non-conforming Merchandise in the amount of $428,269.56 plus prejudgment interest from May 2000;

B.     Awarding HARD ROCK CAFÉ its lost profits from being unable to sell 75,666 t-shirts during its spring-summer 2000 selling season;

C.     Awarding HARD ROCK CAFÉ its incidental and consequential damages representing diminished goodwill and reputation arising from HARD

ROCK CAFÉ's inadvertent sale of defective and non-conforming Merchandise;

D.     Awarding HARD ROCK CAFÉ its reasonable attorneys' fees and costs; and

E.     Awarding HARD ROCK CAFÉ such additional relief as this Court deems just and necessary.

JOHNSON, BLAKELY, POPE, BOKOR
RUPPEL & BURNS, P.A.


Frank R. Jakes        FBN 372226
Trial Counsel
100 North Tampa Street, Suite 1800
Post Office Box 1100
Tampa, FL  33601-1100
(813) 225-2500; Fax (813) 223-7118
E-mail : FRANKJ@JBPFIRM.COM
Attorney for Plaintiff

104087/58704

# Memorandum of Understanding

## Between

## Vendor
## &
## Hard Rock Cafe

Vendor wishes to manufacture and sell to Hard Rock Cafe (HRC) or its designees ("Authorized Purchasers") merchandise, materials or fixtures ("Merchandise") which contain a trademark, character, design, name, symbol or other material ("Licensed Material") owned, copyrighted or licensed by HRC, its parent or affiliated companies, and in connection therewith, Vendor may develop original artwork and designs which will be placed on the Merchandise in conjunction with the Licensed Material ("Artwork"). Vendor understands that if HRC grants Vendor a limited license to reproduce any Licensed Material on or in the Merchandise, it will only be upon Vendor's agreement to the following terms and conditions:

1. **GRANT OF LICENSE:** Vendor will be sent a Purchase Order ("Order") which will identify the Licensed Material(s) which Vendor will be authorized to reproduce only on or in the Merchandise specified in the Order, and only in the quantities set forth therein. Vendor will comply with all terms and conditions contained in the Order and Vendor understands and agrees that the limited license granted by HRC in the Order will only become effective if Vendor notifies HRC in writing of Vendor's acceptance of the Order within ten (10) days after Vendor receives the Order. If Vendor fails to sign and return the acknowledgment copy within that time, the license will automatically expire and terminate. THE MANUFACTURE OF MERCHANDISE CONTAINING LICENSED MATERIAL WITHOUT AN EFFECTIVE LICENSE IS A VIOLATION OF U.S. AND INTERNATIONAL LAW.

2. **USE OF LICENSED MATERIAL:** Vendor will use the Licensed Material to manufacture (or cause to be manufactured) only the type and quantity of Merchandise specified in the Order. Vendor **will** sell such Merchandise only to HRC or an Authorized Purchaser.

II-21



Vendor understands that the provisions of this Memorandum apply only to the exclusive items manufactured for sale to Authorized Purchasers and does not apply to items licensed under separate agreement(s) with HRC, its parent or affiliated companies, which items may from time to time appear on the same Order. Vendor agrees that the Merchandise shall not be the subject of any future license agreement with HRC's parent or affiliated companies without HRC's prior written approval. If any such Merchandise is defective or does not comply with HRC's specifications, then unless such Merchandise is altered by Vendor so as to correct such deficiencies and comply with such specifications, Vendor agrees that Vendor will destroy such Merchandise containing the Licensed Material at no cost to HRC or its Authorized Purchaser. Vendor understands that the limited license granted Vendor in the Order does not give Vendor the right to use any trademark, name, design or symbol owned or copyrighted by HRC, its parent or affiliated companies in any advertising, promotion or publicity, to expressly endorse or imply endorsement of Vendor products or services, or for any purpose or in any manner other than as specifically provided in the Order. Vendor will not display the Merchandise produced for the Order in any trade show or other public exhibition, or in any catalog, advertising or promotional publication, without HRC's prior written approval, which approval may be withheld in HRC's sole discretion. Vendor understands that HRC is the sole owner of any and all molds, plates, engravings and other devices used to reproduce the Licensed Material or the Artwork, and that at such time as HRC shall cease to require further manufacturing or supplying of all or any items ordered by you or an Authorized Purchaser, Vendor shall, according to HRC instructions, either deliver such devices to HRC (or to whomever HRC specifies in writing) or destroy or deface such devices and deliver promptly to HRC evidence of such destruction or defacement that is satisfactory to HRC.

Although Vendor understands Vendor is only authorized to produce Merchandise for which Vendor has written Orders, should there be excess quantities of any Merchandise due to defects, overruns, or any other reason whatsoever, Vendor shall, according to HRC's instructions, destroy or deface such excess Merchandise and deliver to HRC evidence of such destruction or defacement that is satisfactory to HRC, or, in the case of overruns HRC will negotiate in good faith with Vendor to purchase the remaining inventory at a reduced price. Upon **written** approval from HRC, Vendor may dispose of excess merchandise to a charity of HRC's choice.

3. **OWNERSHIP OF ARTWORK:** HRC shall be the exclusive owner of all Artwork produced by Vendor that is incorporated into the Merchandise and HRC shall have all rights therein, including, without limitation, the rights to reproduce, distribute or prepare derivative works from the Artwork. Vendor hereby assigns to HRC all rights Vendor may have in the Artwork. Any Artwork developed by Vendor for the Merchandise shall be deemed to be work for hire, and shall be owned by HRC. To the extent, if any, the Artwork is deemed not to be a "work for hire" within the meaning of §§101 and 201(b) of The Copyright Act of 1976, Vendor hereby assigns, transfers and conveys to HRC all of the exclusive rights comprised in the copyright for the Artwork as fully delineated in §106 of The Copyright Act, as well as any actions, lawsuits or claims of copyright infringement of the images. Vendor agrees to execute any and all necessary paperwork to evidence HRC's ownership of such Artwork, including, but not limited to trademark and/or copyright applications. Vendor hereby agrees to indemnify, defend and hold HRC harmless from and against any and all claims, actions, liability, damage loss and expense (including investigative expense and attorneys' fees incurred in litigation or threatened litigation), judgment, fines and amounts paid in settlement as the result of HRC's purchase of the Merchandise and/or sale or use of the Merchandise and arising or alleged to arise from trademark or copyright infringement; unfair competition relating to any of the Artwork. Vendor represents that the Artwork will be conveyed to HRC free and clear of any lien or other adverse claim against title, and that Vendor will perform a trademark and copyright search to insure that the Artwork is not confusingly similar to any trademark or copyrighted material.

4. **TRADEMARK NOTICES:** As a condition of any license granted to Vendor, Vendor will permanently affix to each and every reproduction of the Licensed Material the following notice: "®", or such other name, phrase or symbol as HRC may designate, in accordance with applicable law. If Vendor fails to properly affix such a copyright/trademark notice, Vendor agrees that Vendor will, at HRC's sole discretion, either destroy the Merchandise containing the Licensed Material, or, at Vendor's sole cost and expense, recall the Merchandise and correct the deficient copyright/ trademark notice, or take such other actions as HRC deems appropriate in HRC's sole discretion.



5. **PRIOR APPROVALS:** Vendor agrees that reproductions of Licensed Material will be in a form approved by HRC in writing. Vendor will submit to HRC for written approval all pre-production samples and any artwork containing Licensed Material which will accompany or appear on or in any Merchandise, or any promotional or packaging material for such items, before their manufacture. The approval of such pre-production samples and artwork is within HRC's sole discretion. HRC's approval shall not be unreasonably withheld.

6. **INDEMNITY AND INSURANCE:** Vendor warrants, guarantees and agrees that the Merchandise the Vendor provides pursuant to any Order:

(a) will not be adulterated or misbranded within the meaning of the U.S. Food, Drug and Cosmetic Act, and will not be an article which may not be introduced into U.S. interstate commerce under the provisions of section 404, 505, or 512 of such Act; and,

(b) will comply with, meet or exceed all applicable statutes, ordinances, administrative orders, rules and regulations of the country of origin and the country of destination. Vendor agrees that Vendor will indemnify and hold harmless HRC and its parent and affiliated companies, and HRC and its officers, directors, agents, employees and representatives, from all liabilities, demands, claims, actions, causes of actions, costs, expenses (including attorney's fees) and penalties of any kind or nature, arising out of or in connection with Vendor's manufacture, distribution or sale of any Merchandise. Vendor agrees that the obligations of indemnity set forth above are intended to survive the expiration or termination of this agreement.

Vendor agrees to maintain in full force and effect at all times during which this Memorandum remains effective and for two (2) years thereafter, Comprehensive General and Commercial Liability insurance, including broad form contractual and products liability coverage waiving subrogation, with combined single limits per occurrence of no less than two million dollars ($2,000,000.00) (U.S. Dollars), Workman's Compensation / Employers' Liability insurance of no less than five hundred thousand dollars ($500,000) (U.S. Dollars), Automobile General Liability insurance of no less than one million dollars ($1,000,000) (U.S. Dollars), and Miscellaneous Errors & Omissions insurance policy of no less than one million dollars ($1,000,000) (U.S. Dollars), which will (1) name HRC, its parent and affiliated companies, and HRC and its officers, directors, agents, employees and representatives on the Certificate of Insurance; and (2) provide HRC with thirty (30)

days prior notice of the cancellation of or a material change in such insurance
coverage. Such insurance shall be carried by an insurer with a BEST rating of
B + V. Along with the executed copy of this Memorandum, and each year
thereafter on or about the anniversary date of this Memorandum, Vendor will
send HRC a Certificate of Insurance evidencing such insurance coverage.

7. **THIRD PARTY MANUFACTURERS:** The license which HRC may grant to Vendor
will be personal to Vendor, and Vendor may not assign, sublicense or transfer
those rights to anyone without HRC's written consent, which consent HRC may
withhold in its sole discretion. If Vendor, at any time, desires to utilize a third party
to manufacture any Merchandise, Vendor will notify HRC of the name and address
of the manufacturer involved and the Merchandise or components thereof which
such manufacturer will produce. Provided HRC has no objection thereto, HRC will
then send Vendor a Consent Agreement for Vendor's signature relative to such
manufacturer and a Manufacturer's Agreement (to be signed by the proposed
manufacturer), both of which must be executed by the respective parties and
returned to HRC before consent will be given and before such Merchandise may
be manufactured.

In the event that Vendor becomes aware of any unauthorized use, manufacture,
distribution or sale by any third party of the Licensed Material, Vendor shall notify
HRC thereof and shall cooperate with HRC at Hard Rock Cafe's expense (without
prejudice, however, to any of HRC's rights hereunder) in the event
that HRC commences any action or proceeding against such
third party.

8. **COMPLIANCE:** Vendor agrees to abide by any and all quality
compliance testing programs promulgated by HRC relating to
the quality and specifications of the Merchandise, at Vendor's
sole cost and expense. Vendor agrees to provide samples of
Merchandise for testing under HRC's compliance programs.
The terms and specifications of this quality compliance
testing program will be given to Vendor under separate
cover prior to the Order, or which are attached as an
exhibit to this Memorandum. HRC shall have the
right to return, and shall not be liable for the
cost, of any Merchandise delivered by
Vendor, which does not meet the
requirements or specifications
of this compliance program.



Further, Vendor agrees to abide by any and all applicable provisions of any federal, state, or local law or ordinance and all lawful orders, rules and regulations issued thereunder within the jurisdiction where Vendor is producing the Merchandise and the United States, if applicable. Additionally, Vendor agrees to abide by HRC's Code of Conduct Compliance program, which deals with child labor, foreign corrupt practices, anti-bribery and environmental protection issues (including other requirements), to remain a vendor of HRC. Vendor will be provided with the details and a copy of HRC Code of Conduct compliance program.

9. **WARRANTIES**: Vendor warrants that the Merchandise manufactured by Vendor shall be free from defects in material, workmanship and title, and shall be of the kind and quality specified or designated by HRC.

10. **RECORDS AND AUDIT:** Vendor agrees to preserve accurate records of all transactions relating to this Memorandum and will allow HRC or its representatives to examine such records, and to make photocopies thereof or extracts therefrom, at all reasonable hours. Vendor agrees to preserve all such records for at least two (2) years after such records are received or generated by Vendor.

11. **PRINCIPAL/AGENCY:** Nothing herein contained shall be so construed as to constitute HRC and Vendor as principal and agent, employer and employee, partners or joint ventures, nor shall any similar relationship be deemed to exist between us. Neither party shall have any power to obligate or bind the other party, except as specifically provided herein.

12. **CONFIDENTIALITY.** Vendor agrees that all information obtained from HRC, including without limitation, ideas, materials (which include but are not limited to artwork, photographs and slides), and any information relating to manufacturing techniques, processes, formulas, developments, experimental works, works in progress, business, trade secrets, scripts, plots, characters or any other matter relating to HRC's artistic creations or business, together with any material prepared by Vendor or on Vendor's behalf which contains or otherwise relates to such information ("Confidential Information"), shall be deemed confidential, and shall not, without HRC's prior written consent, be disclosed to any unauthorized person(s), or be copied, photographed or reproduced in any manner whatsoever, in whole or in part.

Further, all analyses, compilations, studies or other documents or materials ("work product") that are prepared by Vendor, its representatives or employees, together with any services to be performed by Vendor hereunder, will be kept confidential **subject to** the terms of this Memorandum. Vendor will reveal the information obtained from Hard Rock Cafe only to Vendor's representatives and employees who need to know such information for purpose of evaluating a possible transaction or carrying out an agreed upon activity between Vendor and HRC and such representatives and employees shall be informed by Vendor of the confidential nature of such information and shall agree to be bound by the terms and conditions of this Memorandum. Prior to disclosing said Confidential Information and/or work product to Vendor's representatives and employees, Vendor agrees to inform each individual of the confidential nature of said materials and the terms of this Agreement. Upon HRC's request, Vendor will return all such information, and any and all materials connected with or related thereto, to HRC without retaining any copy thereof, and without HRC's prior written consent, Vendor will not issue nor authorize the dissemination of any publicity or news story relating to (i) the information, (ii) any agreement with HRC or (iii) any services or merchandise supplied by Vendor hereunder.

13. **ACKNOWLEDGMENTS**: Vendor understands, acknowledges and agrees that:

(a) any Orders which HRC or any Authorized Purchaser submits to Vendor will be governed by the terms and conditions of such Orders and this Memorandum, and that no payment will be made to Vendor on such Orders unless and until Vendor returns to HRC a signed copy of this Memorandum;

(b) HRC and any Authorized Purchaser will rely upon this Memorandum in sending Vendor any such Orders;

(c) the Authorized Purchasers are intended to be third-party beneficiaries under this Memorandum;

(d) the terms and conditions of this Memorandum and any Orders which HRC or any authorized Purchaser submits to Vendor shall constitute the entire agreement between HRC and Vendor with respect to the subject matter of this Memorandum and shall supersede any previous agreement between HRC and Vendor, whether oral or written concerning the subject matter of this Memorandum;

(e) no waiver or modification of any provision of this Memorandum will be valid unless in writing and signed by the party to be charged,



(f) this Memorandum and the Order and interpretation thereof shall be governed by the laws of the State of Florida, United States, specifically including the provisions of the Uniform Commercial Code, as adopted by that state, and excluding the provisions of the Convention on the International Sale of Goods and

(g) Vendor hereby consents to jurisdiction in the state or federal courts residing in Orange County, Florida, United States to resolve any dispute under the Order or this Memorandum,

(h) the prevailing party in any litigation arising under the Order or this Memorandum shall be entitled to recover from the other party reasonable attorneys' fees and costs.


**PLEASE SIGN BELOW TO INDICATE YOUR AGREEMENT WITH THE FOREGOING. THE PERSON SIGNING THIS MEMORANDUM OF UNDERSTANDING HEREBY REPRESENTS THAT HE OR SHE IS DULY AUTHORIZED TO ACT ON BEHALF OF, AND BIND, THE VENDOR.**


**Hard Rock Cafe**

| | |
|---|---|
| Signature of Authorized Official | 6/9/00  Date |

**Doug Mangino**
Typed Hard Rock Cafe
Official's Name

**Vice President - Merchandise**
Title

**Orlando, FL 32835**
City, State, ZIP Code

Witness                        6/9/00  Date


**Vendor Approval**

| | |
|---|---|
| Signature of Authorized Official | 6 2 00  Date |

Dean Johnson
Typed Vendor Official's Name

Sr. Vice President- National Accounts
Title

Woodinville, WA 98072
City, State, ZIP Code

Witness                        6·2·00  Date

# Hold Harmless Agreement
# And Guaranty / Warranty Of Product

To Whom It May Concern:

The undersigned person or entity, including any 3rd Party Manufacturers, subcontractors or factories owned by Seller ("Seller"), for value received, hereby represents and agrees as follows:

1. The articles contained in any shipment or delivery made by Seller, its subsidiaries or divisions (a "Product") made to or on the order of HRC, its subsidiaries, affiliates or divisions (collectively referred to as "Buyer") is hereby guaranteed, as of the date of such shipment or delivery,

   a. to not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act (the "Act"),

   b. to not be an article which cannot be introduced into interstate commerce under the provisions of Sections 404 and 505 of the Act, and

   c. to be in compliance with all applicable Federal, State and Local laws.

2. Seller agrees to defend, indemnify and hold harmless Buyer and its employees, officers, directors and customers (individually, and "Indemnitee") from all action, suits, claims and proceedings ("Claims"), and any judgments, damages, fines, costs and expenses (including reasonable attorney's fees) resulting therefrom:

   a. brought or commenced by Federal, State or Local Governmental Authorities against any Indemnitee alleging that any Product sold by Seller to or on the order of Buyer did not, as of the date of delivery, meet the guaranty set forth in Paragraph 1; or

   b. brought or commenced by any person or entity against any Indemnitee for the recovery of damages for the injury, illness and/or death of any person or damage to property arising out of or alleged to have arisen out of

      i. the delivery, sale, resale, labeling, use or consumption of any Product produced and distributed by Seller, or

II-17



ii. the negligent acts or omissions of Seller; provided, however, that the Seller's indemnification obligations hereunder shall not apply to the extent that Claims are caused by the negligence of Buyer.

Seller's agreement to maintain and provide insurance on behalf of Buyer under Paragraph 3 is a result of the requirement for indemnity and defense outlined in this paragraph. Indemnity shall notify Seller promptly of the service of process or the receipt of actual notice of any claim.

Seller agrees to maintain in full force and effect at all times during which this Memorandum remains effective and for two (2) years thereafter, Comprehensive General and Commercial Liability insurance, including broad form contractual and products liability coverage waiving subrogation, with combined single limits per occurrence of no less than two million dollars ($2,000,000.00), Workman's Compensation/Employers' Liability insurance of no less than five hundred thousand dollars ($500,000), Automobile General Liability insurance of no less than one million dollars ($1,000,000), and Miscellaneous Errors & Omissions insurance policy of no less than one million dollars ($1,000,000), which will (1) name HRC, its parent and affiliated companies, and HRC and its officers, directors, agents, employees and representatives on the Certificate of Insurance; and (2) provide HRC with thirty (30) days prior notice of the cancellation of or a material change in such insurance coverage. Such insurance shall be carried by an insurer with a BEST rating of B + V. Each year thereafter, Vendor will send HRC a Certificate of Insurance evidencing such insurance coverage.

3. This Guaranty and Agreement is continued and shall be in full force and effect and shall be binding upon the Seller with respect to each and every Product shipped or delivered to Buyer by the Seller before the receipt of the Buyer of written notice of revocation thereof.

**PLEASE SIGN BELOW TO INDICATE YOUR AGREEMENT WITH THE FOREGOING. THE PERSON SIGNING THIS HOLD HARMLESS AGREEMENT HEREBY REPRESENTS THAT HE OR SHE IS DULY AUTHORIZED TO ACT ON BEHALF OF, AND BIND, THE VENDOR.**

| Hard Rock Cafe | Vendor Approval |
|---|---|
| *[signature]* 6/9/00 | *[signature]* 6-2-00 |
| Signature of Authorized Official    Date | Signature of Authorized Official    Date |
| **Doug Mangino** | Dean Johnson |
| Typed Hard Rock Cafe Official's Name | Typed Vendor Official's Name |
| **Vice President - Merchandise** | Sr. Vice President- National Accounts |
| Title | Title |
| **Orlando, FL 32835** | Woodinville, WA 98072 |
| City, State, ZIP Code | City, State, ZIP Code |
| *[signature]* Amy R Everett 6/9/00 | *[signature]* 6-2-00 |
| Witness    Date | Witness    Date |



**This page intentionally left blank.**

# Hard Rock Cafe
## Purchase Order Terms

All Hard Rock Cafe (HRC) vendors will be required to adhere to the following terms and conditions.

1. Electronic data interchange technology

2. One percent (1%) warehouse discount

3. One percent (1%) new store discount

4. Fifty-fifty (50/50) freight terms [one hundred percent (100%) within any commercial zone to the local distribution center]

5. Floor ready merchandise (i.e., flat folding, preticketing, etc.)

6. One percent (1%) off invoice in lieu of returning salvaged merchandise

### HRC Contact for Routing and Shipping

Tony Paladino, Director of Planning, Distribution and Logistics
407-445-7625, Extension 2910



II-1



**PLEASE SIGN BELOW TO INDICATE YOUR AGREEMENT WITH THE FOREGOING. THE PERSON SIGNING THIS PURCHASE ORDER TERMS AGREEMENT HEREBY REPRESENTS THAT HE OR SHE IS DULY AUTHORIZED TO ACT ON BEHALF OF, AND BIND, THE VENDOR.**

**Hard Rock Cafe**

Signature of Authorized Official     Date

**Doug Mangino**

Typed Hard Rock Cafe Official's Name

**Vice President - Merchandise**

Title

**Orlando, FL 32835**

City, State, ZIP Code

Witness     Date

**Vendor Approval**

Signature of Authorized Official     Date

Dean Johnson

Typed Vendor Official's Name

Sr.Vice President-National Accounts

Title

Woodinville,WA 98072

City, State, ZIP Code

Witness     Date

II-2

# Purchase Order
# Terms and Conditions

The text of the Hard Rock Cafe (HRC) "Terms and Conditions" follows. Said Terms and Conditions will govern in the event of any conflict between the Purchase Order ("Order") and any other document.

1. **Seller's Obligation**: Seller must have a valid Order prior to shipping merchandise to any HRC operating company.

2. **Authorized Purchase Order**: A written Order shall constitute an offer on the part of the Buyer upon these Terms and Conditions and become a binding contract between Buyer and Seller upon Seller's acceptance of the Order. Buyer must be notified in writing within three (3) days after Seller's receipt of this Order, and prior to shipment, as to any term, condition or specification hereof which is not acceptable to Seller. Failure to give such notice shall be deemed acceptable to Seller of all terms, conditions and specifications of this Order.

3. **EDI 850 Purchase Order**: An Order, when in the form of an EDI transmission, shall constitute an offer on the part of Buyer upon these Terms and Conditions indicated in the EDI transmission and shall become a binding contract between Buyer and Seller upon Seller's acceptance of the Order by:

   a. Delivering to Buyer in accordance with Terms and Conditions as set forth in the Order, all or any part of the merchandise ordered; or

   b. Failure to notify Buyer in writing of any objections to this content within three (3) days constitutes acceptance of the Order.

4. **Do Not Ship Before Date**. The merchandise shall not be shipped prior thereto without written approval of Buyer. Buyer reserves the right to reject shipments of merchandise which are received before the "Do Not Ship Before" date.

5. **Do Not Ship After Date**. Seller shall complete delivery on or before the "Do Not Ship After" date, as so specified. This Order shall be deemed cancelled without notice or any other action on the part of Buyer if delivery of such merchandise has not been completed prior to the "Do Not Ship After" date specified on the face hereof.

Any and all extensions to the "Do Not Ship After" date must be given by the Buyer in writing. On orders received past the extension date, a ten percent (10%) discount will be taken at cost if the Buyer chooses to accept the shipment.

6. As used herein, the following terms shall have the following meaning:

   a. "Order" means this Purchase Order, or an Order effectuated through Electronic Data Interchange transmission (EDI), including, in either, these Terms and Conditions.

   b. "Merchandise" refers to the goods, products, supplies, parts, assemblies, specifications, services or other items constituting the subject matter of the Order, which is to be furnished by the Seller to the Buyer hereunder.

   c. "Specifications" include, but are not limited to, designs, drawings, blueprints, engineering standards, technical data, samples and models.

   d. "Tools" mean special tools, jigs, dies, fixtures, templates, patterns and/or molds.

7. Seller represents and warrants to the Buyer, in addition to all warranties implied by law, that the Merchandise described on the face hereof, together with all related packaging, labeling and other printed matter, and all related advertisements furnished or authorized by Seller, shall:

   a. be free from defects in design, workmanship or materials, including, without limitation, such defects as could create a hazard to life or property;

   b. be suitable for end use;

   c. be manufactured, packed for shipment marked with the country of origin, and where required, be registered, all in accordance with applicable United States Federal, State and local laws, and all orders and regulations promulgated thereunder;

   d. not infringe or encroach upon any party's personal, contractual or proprietary rights, including patent, trademark, trade name, service mark, copyright, right of privacy or trade secret rights;

e. conform to all specifications and other descriptions set forth or incorporated herein, and to all articles accepted by Buyer as merchandise samples;

f. possess all performance qualities and characteristics claimed in advertisements issued or authorized by Seller;

g. be in conformity with the Federal Food, Drug and Cosmetics Act, the Federal Trade Commission Act or any other Federal, State or Municipal law, regulation or order as well as all applicable industry voluntary standards including, but not limited to, the ASTM F963 Standard Consumer Safety Specification on Toy Safety and Toy Manufacturer's Association voluntary standard on DI (2-Ethylhexyl) Phthalate;

h. be properly stamped, tagged, labeled or marked with such information as may be required by any applicable law, regulation or order of Buyer,

i. not be misbranded within the meaning of the Wool Products Labeling Act (if applicable);

j. meet the requirements of the Consumer Product Safety Act, the Federal Hazardous Substances Act, the Flammable Fabrics Act, the Fur Products Labeling Act, the Wool Products Act, the Textile Fiber Products Identification Act and Fair Packaging and Labeling Act to the extent that the Merchandise is covered by those Acts, or any of them. Seller also represents and warrants that:

   i. the weights, measures and sizes of all Merchandise shall be as represented and conform to all standards, regulations and requirements of any Federal, State or Local governmental authorities having jurisdiction; and

   ii. the prices, Terms and Conditions of sale hereunder and any discount, rebate or allowance for advertising or otherwise granted by Seller in connection herewith are not in violation of the Robinson-Patman Act and are in compliance with all applicable laws and regulations; and

   iii. no forced labor shall be utilized in connection with the manufacture of the Merchandise. Seller's representation and warranties herein shall survive the delivery of Merchandise to Buyer and any resale of Merchandise by Buyer.



      iv.  Vendors are required to adhere to the HRC Code of Conduct.

8.  When an Order requires any work or services to be performed, Seller shall:

    a.  perform such work or services strictly as an independent contractor and not as an employee of Buyer;

    b.  have sole liability for all payroll taxes and contributions payable under the Federal Insurance Contribution Act, the Federal Unemployment Tax Act, and any applicable State unemployment insurance or compensation laws and any amendments thereto, with respect to the employment of persons in connection with the prosecution and completion of the work to be performed; and Seller shall indemnify Buyer against the payment of such payroll taxes and contributions and any loss or expense that may result from Seller's failure to comply with such laws and amendments;

    c.  perform all work and services in such a manner as to guarantee the safety of persons and property. Seller shall indemnify and defend Buyer against any claim, suit, governmental action, loss, damage or expense (including attorneys' fees) resulting from or arising out of the performance of any work or services, or the failure of said work or services to comply with Paragraph 2 above, whether or not due to negligence on the part of Buyer, its subsidiaries, affiliates, agents or employees. Prior to making payments for any work or services, Buyer may demand appropriate mechanics' lien affidavits or lien waivers in a form satisfactory to its counsel.

9.  Seller, at its sole cost and expense, shall perform, or cause to be performed, all tests on the Merchandise required by the Consumer Product Safety Commission and any other Federal, State or Local governmental agency or authority having jurisdiction as well as all applicable industry voluntary standards and shall maintain for a period of not less than three (3) years certificates indicating that all applicable tests have been administered and passed. Such tests shall be conducted by laboratories acceptable to the agency or authority requiring same. Seller shall make available, and at Buyer's request shall furnish to Buyer, copies of all such certificates and shall permit Buyer or any person or persons authorized by Buyer to inspect and make copies of all records maintained by Seller in connection with such tests.

10. Seller shall provide Buyer at Buyer's National Office, a Material Safety Data Sheet as required pursuant to the Occupational Safety and Health Act, and any other Federal, State or Municipal law, regulation or order prior to the delivery of Merchandise. A Material Safety Data Sheet shall also be provided to Buyer at Buyer's job site upon delivery of the Merchandise.

11. No terms or conditions in any acceptance, acknowledgment, invoice or other document submitted by Seller which are in conflict with, different from or in addition to these Terms and Conditions, nor any modification of the Order, shall be binding upon Buyer unless agreed to in writing by a duly authorized representative of Buyer. Seller cannot show product in catalogs, brochures, etc., without written consent from HRC. Any employee, agent or other representative of Seller presenting, displaying or demonstrating the Merchandise in any form, including but not limited to samples, replicas, catalogs or brochures shall be deemed to have authority to accept the Order and the Terms and Conditions set forth therein.

12. Seller, at Seller's expense, shall upon request from Buyer, provide Buyer with a reasonable number of samples of the Merchandise prior to, during and after production of the Merchandise, with exact quantity to be determined at time of order placement.

13. The Merchandise shall be subject to inspection by Buyer and/or government inspectors upon the premises of the Seller or Factory of origin. Seller, without additional cost to Buyer, shall provide reasonable facilities and assistance for the safety and convenience of such inspection. Notwithstanding any inspection at Seller's premises of the Merchandise, Buyer shall have the right to inspect the Merchandise at Buyer's premises prior to acceptance and payment.

14. **Right of Termination**

    a.  Buyer may terminate an Order, or any part thereof, by notice to Seller under any of the following circumstances:

        i.  if Seller fails to comply with any provisions of the Order

        ii.  if Seller becomes insolvent or makes a general assignment for the benefit of creditors or files or has filed against it a petition of bankruptcy or for reorganization, or pursues any other remedy under any other law relating to the relief for debtors or in the event a receiver is appointed for Seller's property or business.



In the event of such termination, in addition to all other rights and remedies Buyer may have at law, in equity or under these Terms and Conditions, Buyer may purchase or manufacture similar Merchandise and/or require Seller to transfer title and deliver to Buyer any and all property produced or procured by Seller under the Order, and Seller shall be liable to Buyer for any excess cost to Buyer.

b. In addition to Buyer's right to terminate an Order for cause pursuant to Paragraph 14(a) above, Buyer may terminate an Order in whole or in part at any time upon notice to Seller. On receipt by Seller of such notice, Seller shall, to the extent specified therein, stop work thereunder and the placement of subcontracts, terminate work under subcontracts outstanding thereunder, and take any necessary action to protect property in Seller's possession in which Buyer has or may acquire an interest. In such event, Buyer shall pay to Seller the amounts due for supplies delivered and accepted or services completed in accordance herewith prior to the effective date of termination.

c. Any termination by Buyer whether for cause or otherwise, shall be without prejudice to any claims for damages or other rights of Buyer against Seller.

d. Seller shall continue performance of the Order to the extent not terminated.

15. Buyer shall have the right to refuse Merchandise not in accordance with Specifications or industry standard, or which is different in quality or quantity from that ordered, or which is shipped otherwise than as specified under the Order. Buyer may, at its sole discretion, either return rejected Merchandise or hold same at Seller's risk and expense and may, in either event, charge the Seller with the cost of transportation, shipping, unpacking, examining, repacking, storing, reshipping and other like expenses. If Seller fails to accept Merchandise returned by Buyer, then Buyer shall have the right to dispose of such Merchandise by any means. If within ten (10) days after a request by Buyer for direction regarding disposition of rejected Merchandise Seller does not respond to Buyer or refuses to accept a return of such Merchandise, then Buyer shall have the right to dispose of the Merchandise by any means. Acceptance of any prior shipments contrary to the Order shall not be considered a waiver of Buyer's right to return any or all of the Merchandise and receive full credit therefore. Authorization for substitution of style, color, size, quantity or a combination thereof, is permitted only upon the written, signed and dated consent of Buyer.

Any claims for defective Merchandise, shortages, returns, damages or other claims asserted as a result of Seller's failure to comply with these Terms and Conditions made by Buyer will be charged back to Seller and the amount thereof deducted from payments to be made to Seller or, alternatively, will be promptly refunded to Buyer. Buyer reserves the right to withhold up to ten percent (10%) of any invoice for sixty (60) days in lieu of any defective or damaged merchandise and/or future claims.

16. Buyer may at any time after delivery of the Merchandise (and whether or not the same has been accepted by Buyer) return all or part of the Merchandise if any portion is found to be in a damaged or defective condition, and Seller shall refund to Buyer in full the price paid by Buyer for such returned Merchandise. Any Merchandise so returned shall be at Seller's risk and expense.

17. Any excess inventory (overruns, defects, returns, etc.) cannot be offered for sale by Seller or through third parties. Disposition of such Merchandise must be pre-approved by HRC in writing.

18. If Seller shall fail to affix to the Merchandise appropriate or correct pricing data (including but not limited to Universal Product Codes or price labels), then Buyer may return such Merchandise to Seller and may charge the Seller with the cost of transportation, shipping, unpacking, examining, repacking, reshipping and other like expenses. Any claims for failure to affix appropriate or correct pricing data made by Buyer will be charged back to Seller and the amount thereof deducted from payments to be made to Seller or, alternatively, will be promptly refunded to Buyer.

19. The parties hereto agree that in the event Seller has represented that it will publicly advertise the Merchandise in accordance with a proposed schedule and thereafter Seller shall, without the prior written approval of Buyer, fail to advertise Merchandise strictly in accordance with such schedule, Buyer may return such Merchandise to Seller and may charge the Seller with the cost of transportation, shipping, unpacking, examining, repacking, reshipping and other like expenses. Any claims for failure to advertise the Merchandise in accordance with such schedule made by Buyer shall be charged back to Seller and the amount thereof deducted from payments to be made to Seller or, alternatively, to be promptly refunded to Buyer. Buyer may charge Seller for all costs associated to correct at the Hard Rock Cafe warehouse.



20. Shipments of Merchandise shall be made to such location(s) of Buyer as are indicated in the Order. All shipments shall be made FOB as designated on the face of the Order or, if not designated, place of destination, unless Merchandise is shipped UPS, in which case shipments shall be FOB place of destination and Buyer shall not be liable for any insurance or receipt charges. No special handling charges shall be paid by Buyer. Title to the Merchandise ordered, as well as risk of loss, shall remain in Seller regardless of when payment is made by Buyer to Seller, until the Merchandise reaches the directed point of destination. However, regardless of the passage of title, loss or damage discovered after transfer of title determined to be a result of faulty packaging or handling by Seller shall be Seller's responsibility. Seller represents and warrants that the Merchandise shall be of first quality, free and clear of all liens, encumbrances or adverse claims from original manufacturers, inventors, licensing agents, factors or any other entity. Merchandise shipped collect must be shipped in accordance with Buyer's Routing Guide or Seller's shall be charged back for any freight costs incurred and any handling fees which may be assessed by Buyer as a result of Seller's failure to ship in accordance with such Routing Guide.

21. Seller shall not make partial shipments without the written consent of Buyer. Additional freight costs for partial and multiple shipments sent to one location on the same day shall be charged back to Seller. Merchandise shipped to a location other than the designated receiving location shall be subject to a handling charge of either $100.00 or 2% of total cost of Order, whichever is greater.

22. End of Month (EOM) dating shall begin at the date of Seller's invoice, or the date of receipt of Merchandise by Buyer, in accordance with the terms of the Order, whichever is later. Under EOM terms, if the date as calculated above falls on or after the 20th of the month, the dating shall be considered as of the first of the following month. Net bills shall be paid within thirty (30) days of the dating or, under EOM terms, according to the terms of the Order. The Order is subject to anticipation for prepayment computed from the date of receipt of the Merchandise.

23. Buyer's obligations to make payments to Seller pursuant to the Order shall be subject to any markdown allowance, advertising allowance, trade discount, new store discount, volume discount, reserve or any other allowance, discount or reserve normally set by Buyer in the course of Buyer's business.

24. Buyer reserves the right to deduct from any amount due Seller for Merchandise ordered any amount Seller owes Buyer with respect to any claims of any nature whatsoever in favor of Buyer against Seller, whether or not related to the Order and whether now existing or hereafter arising, and any assignee of the Seller's rights to payment hereunder shall be subject to Buyer's right under this Paragraph.

25. Buyer reserves the right to withhold any payments due Seller, without penalty or forfeiture, until all disputes whether or not related to the Order and whether or not existing or arising in the future between Buyer and Seller are settled.

26. Seller shall defend, indemnify and hold Buyer harmless against any and all alleged, actual or threatened liability, claim, loss or damage arising in connection with the possession, handling, use, resale, labeling or return of the Merchandise ordered (if the Merchandise shall include the sale of services, the provision of such services), including but not limited to, patent, copyright and trademark infringement actions, or due to Seller's breaching of its warranties made herein. Seller shall defend every suit which may be brought against Buyer by reason of any of the foregoing, whether meritorious or not, and shall pay all expenses and fees of counsel which shall be incurred in connection with such defense, together with all costs, damages and profits recoverable in every such suit or settlement thereof. If Seller fails to take timely action to defend such a suit, Buyer may defend such suit at Seller's expense. Buyer, in addition to any other rights, may forthwith cancel any unshipped portion of the Order and return prior deliveries to Seller for payment or credit.

Vendor agrees to maintain in full force and effect at all times during which this Memorandum remains effective and for two (2) years thereafter, Comprehensive General and Commercial Liability insurance, including broad form contractual and products liability coverage waiving subrogation, with combined single limits per occurrence of no less than two million dollars ($2,000,000.00), Workman's Compensation/Employers' Liability insurance of no less than five hundred thousand dollars ($500,000), Automobile General Liability insurance of no less than one million dollars ($1,000,000), and Miscellaneous Errors & Omissions insurance policy of no less than one million dollars ($1,000,000), which will:

(1) name HRC, its parent and affiliated companies, and HRC and its officers, directors, agents, employees and representatives on the Certificate of Insurance; and



(2) provide HRC with thirty (30) days prior notice of the cancellation of or a material change in such insurance coverage. Such insurance shall be carried by an insurer with a BEST rating of B + V. Each year thereafter, Vendor will send HRC a Certificate of Insurance evidencing such insurance coverage.

27. Time is hereby made of the essence of the Order. If delivery of Merchandise or rendering of services is not completed by the date set by Buyer, Buyer reserves the right, without liability and in addition to its other rights and remedies at law, in equity or under the terms of the Order, to purchase elsewhere and hold Seller liable for any additional loss, cost, damage or expense incurred thereby. Seller shall pay any loss, cost, damage or expense resulting from the untimely receipt of the Merchandise ordered. Seller shall notify Buyer immediately if it is unable to ship timely. Buyer shall have the right to refuse any goods delivered beyond agreed upon delivery date and to cancel the balance of the Order for any part of the goods due after delivery date of any installments. By accepting the untimely delivery of any installment, Buyer shall not be bound to accept future shipments nor be deprived of its right to return Merchandise already accepted nor to claim damages for untimely delivery.

28. Buyer shall have the right to require Seller to postpone shipment of Merchandise or suspend work covered by the Order and Seller shall take all reasonable steps to minimize costs during such suspension. Equitable adjustment shall be made to the price, delivery schedule or other provisions affected by the suspension, provided that the claim for equitable adjustment is made within thirty (30) days after Buyer directs the continuation of the work.

29. Except as otherwise provided herein, and unless prohibited by statute, Seller shall pay any Federal, State or Local use tax, transportation excise tax, or other tax, which may be imposed in connection with the performance of the Order.

30. Buyer shall not be bound by any assignment of the Order or any right to receive payment thereunder or of any claim thereunder by operation of law or otherwise unless Buyer has in writing consented thereto; and in the absence of such written consent, any payment made or any return of goods partial or otherwise to Seller shall automatically operate as, and constitute, a complete release to Buyer.

31. Buyer's failure to insist on strict performance of any term or terms hereunder shall not constitute a waiver of any term or default by Seller. Any waiver of any breach or default hereof shall not constitute a waiver by Buyer of any other or subsequent breach or default of Seller.

32. The prices specified in the Order are not subject to any additional charges for packing or preparation for shipment or because of increased costs of operation, or because of any taxes or excises levied on processors, manufacturers, wholesalers or otherwise. The Order shall not, without written authorization from Buyer, be filled at higher prices than specified therein, or, if the Order is unpriced, at prices higher than last charged or quoted to Buyer for Merchandise described therein. Seller agrees that any price reduction made in Merchandise described in the Order prior to the delivery of such Merchandise to Buyer shall be applicable to the Order. Whenever price is dependent upon cubic density, Seller shall specify such density.

33. Seller agrees that it shall make the same agreement made in the Order on proportionately equal terms with any other party similarly situated to whom Seller sells its merchandise. If, within one (1) year after final delivery under the Order, Seller offers to sell or sells to any other party merchandise substantially of the same kind as ordered therein, at lower prices and/or on terms more favorable than those stated therein, the prices and/or terms in the Order shall be revised to equal the lowest price and/or most favorable terms at which Seller so offers or sells such merchandise.

34. **Tools, Specifications and Materials**

   a. All Tools, Specifications and Materials furnished or specifically paid for by Buyer shall be Buyer's property, shall be held at Seller's risk and upon demand, shall be delivered to Buyer or duly accounted for. Buyer does not warrant accuracy of Tools, which it furnishes. Materials and Tools furnished by Buyer to Seller for the performance of the Order shall be inspected by Seller prior to using or processing them, and Buyer's responsibility for defects shall be limited to the placement of original materials or Tools. While in Seller's possessions, all such property utilized in the manufacture of Merchandise for Buyer shall be fully maintained by Seller at Seller's expense.

   b. While Buyer's Tools, Specifications and Materials remain in Seller's possession, all such property of Buyer shall be insured by Seller at Seller's cost and expense for their replacement value against loss by theft, fire and other hazard included in extended coverage insurance.



In the event of any loss, the insurance proceeds shall be paid over to Buyer. Seller shall furnish Buyer with certificates evidencing such insurance.

c. To the extent that Tools, Specifications or other information are furnished or paid for by Buyer, Seller shall not make use of or disclose the nature or content of same, except as necessary to perform the Order or as otherwise expressly authorized in writing by Buyer.

35. **Merchandise Purchased by Buyer**

a. For Merchandise purchased by Buyer for resale:

   i. Buyer acknowledges that it holds valid resale numbers in all states where Buyer is licensed to do business (excluding states not recognizing sales for resale as sales tax exempt).

   ii. Seller shall furnish Buyer, when required by law, attention Buyer's Tax Department, the appropriate exemption certificate that shall be completed by Buyer and returned to Seller. Buyer's "Blanket Resale Certificate" may be substituted by buyer, if permitted by law.

b. For Merchandise purchased by Buyer for its own use, the following shall apply:

   i. Seller hereby certifies that it holds valid Certificates of Authority to collect State sales tax and that Seller shall collect such State sales tax only for State taxes where said authority exists and where the law and circumstances require collection. It is understood that if shipment of tangible personal property is made directly to a State in which Seller does not hold a valid

   Certificate of Authority, Seller shall not collect State sales tax. Under such circumstances, Buyer shall be responsible for reporting use tax to the appropriate state, if applicable.

ii. If an item is exempt from sales tax collection for any reason, including but not limited to, sales for resale, sales for export, capital improvements where exempt, or services where exempt. Seller shall furnish Buyer (when required by law), attention Buyer's Tax Department, the appropriate exemption certificate that shall be completed by Buyer and returned to Seller.

iii. Seller acknowledges that Seller is knowledgeable of the various State sales tax laws applicable to transportation or freight and services and Seller agrees not to collect State sales tax from Buyer in states where such items are exempt from taxation.

**PLEASE SIGN BELOW TO INDICATE YOUR AGREEMENT WITH THE FOREGOING. THE PERSON SIGNING THIS PO TERMS & CONDITIONS AGREEMENT HEREBY REPRESENTS THAT HE OR SHE IS DULY AUTHORIZED TO ACT ON BEHALF OF, AND BIND, THE VENDOR.**

| **Hard Rock Cafe** | **Vendor Approval** |
|---|---|
| Signature of Authorized Official   Date | Signature of Authorized Official   Date |
| **Doug Mangino** | Dean Johnson |
| Typed HRC Official's Name | Typed Vendor Official's Name |
| **Vice President - Merchandise** | Sr. Vice President- National Accounts |
| Title | Title |
| **Orlando, FL 32835** | Woodinville, WA 98072 |
| City, State, ZIP Code | City, State, ZIP Code |
| Witness   Date | Witness   Date |



**This page intentionally left blank.**

Page

# Domestic Vendor

FAXED
F 1/3/20 D

**6100 Old Park Lane**
PH 407-445-76   FX 407-445-7770
Florida

**Vendor:** Sunrise Clothing Group
14051 NE 200th Street
Woodinville
WA
98072
US
800-424-9272

**Ship To:**

| PO Number | GM-000922 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

Giant Merchandising
8457 Eastern Ave. # A

Bell Gardens
Caifornia
90201
US
323-887-3300

| U/M | Order Qty | Total Cost |
|---|---|---|
| EACH | 37,440 | $211,910.40 |

**Hard Rock UPC**
008934376888

**Vendor UPC**

**Description**
Garment Dyed Tee-Green

**City**
**Aspen (25)**

| Size | Ticket UPC | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| S | 008934376895 | 72 | $5.66 | $407.52 |
| M | 008934376901 | 144 | $5.66 | $815.04 |
| L | 008934376918 | 216 | $5.66 | $1,222.56 |
| XL | 008934376925 | 144 | $5.66 | $815.04 |
| XXL | 008934376932 | 72 | $5.66 | $407.52 |
| | | 648 | | $3,667.68 |

**City**
**Dallas (13)**

| Size | Ticket UPC | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| S | 008934377243 | 72 | $5.66 | $407.52 |
| M | 008934377250 | 216 | $5.66 | $1,222.56 |
| L | 008934377267 | 432 | $5.66 | $2,445.12 |
| XL | 008934377274 | 288 | $5.66 | $1,630.08 |
| XXL | 008934377281 | 216 | $5.66 | $1,222.56 |
| | | 1,224 | | $6,927.84 |

**City**
**Denver (42)**

| Size | Ticket UPC | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| S | 008934377298 | 144 | $5.66 | $815.04 |
| M | 008934377304 | 288 | $5.66 | $1,630.08 |
| L | 008934377311 | 576 | $5.66 | $3,260.16 |
| XL | 008934377328 | 432 | $5.66 | $2,445.12 |
| XXL | 008934377335 | 288 | $5.66 | $1,630.08 |
| | | 1,728 | | $9,780.48 |

**City**
**Honolulu (31)**

| Size | Ticket UPC | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| S | 008934377441 | 144 | $5.66 | $815.04 |
| M | 008934377458 | 288 | $5.66 | $1,630.08 |

# Domestic Vendor

6100 Old Park Lane
PH 407-445-76
Florida
FX 407-445-7770

**Vendor:** Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

| PO Number | GM-000922 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

**Ship To:** Giant Merchandising
8457 Eastern Ave. # A

Bell Gardens
Caifornia
90201
US
323-887-3300

## Hard Rock UPC — Honolulu (31)

| Vendor UPC | Description | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437465 | L | 576 | $5.66 | $3,260.16 |
| 00893437472 | XL | 432 | $5.66 | $2,445.12 |
| 00893437489 | XXL | 288 | $5.66 | $1,630.08 |
| | | 1,728 | | $9,780.48 |

## City — Houston (27)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437496 | S | 72 | $5.66 | $407.52 |
| 00893437502 | M | 144 | $5.66 | $815.04 |
| 00893437519 | L | 288 | $5.66 | $1,630.08 |
| 00893437526 | XL | 216 | $5.66 | $1,222.56 |
| 00893437533 | XXL | 144 | $5.66 | $815.04 |
| | | 864 | | $4,890.24 |

## City — Hollywood (21)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437540 | S | 576 | $5.66 | $3,260.16 |
| 00893437557 | M | 1,224 | $5.66 | $6,927.84 |
| 00893437564 | L | 2,376 | $5.66 | $13,448.16 |
| 00893437571 | XL | 1,800 | $5.66 | $10,188.00 |
| 00893437588 | XXL | 1,224 | $5.66 | $6,927.84 |
| | | 7,200 | | $40,752.00 |

## City — Kona (37)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437694 | S | 72 | $5.66 | $407.52 |
| 00893437700 | M | 216 | $5.66 | $1,222.56 |
| 00893437717 | L | 432 | $5.66 | $2,445.12 |
| 00893437724 | XL | 288 | $5.66 | $1,630.08 |
| 00893437731 | XXL | 216 | $5.66 | $1,222.56 |
| | | 1,224 | | $6,927.84 |

# Domestic Vendor

6100 Old Park Lane
PH 407-445-76
Florida
FX 407-445-7770

**Vendor:** Sunrise Clothing Group
14051 NE 200th Street
Woodinville
WA
98072
US
800-424-9272

| PO Number | GM-000922 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

**Ship To:** Giant Merchandising
8457 Eastern Ave. # A
Bell Gardens
Caifornia
90201
US
323-887-3300

| Hard Rock UPC | Vendor UPC | Description | Quantity | Unit Cost | Total | Order Qty | U/M |
|---|---|---|---|---|---|---|---|
| City | Ticket UPC | Size | | | | | |
| Los Angeles (20) | 00894377748 | S | 72 | $5.66 | $407.52 | | |
| | 00894377755 | M | 216 | $5.66 | $1,222.56 | | |
| | 00894377762 | L | 432 | $5.66 | $2,445.12 | | |
| | 00894377779 | XL | 288 | $5.66 | $1,630.08 | | |
| | 00894377786 | XXL | 216 | $5.66 | $1,222.56 | | |
| | | | 1,224 | | $6,927.84 | | |
| City | Ticket UPC | Size | | | | | |
| La Jolla (43) | 00894377793 | S | 72 | $5.66 | $407.52 | | |
| | 00894377809 | M | 144 | $5.66 | $815.04 | | |
| | 00894377816 | L | 216 | $5.66 | $1,222.56 | | |
| | 00894377823 | XL | 144 | $5.66 | $815.04 | | |
| | 00894377830 | XXL | 72 | $5.66 | $407.52 | | |
| | | | 648 | | $3,667.68 | | |
| City | Ticket UPC | Size | | | | | |
| Lake Tahoe (41) | 00894377847 | S | 144 | $5.66 | $815.04 | | |
| | 00894377854 | M | 288 | $5.66 | $1,630.08 | | |
| | 00894377861 | L | 576 | $5.66 | $3,260.16 | | |
| | 00894377878 | XL | 432 | $5.66 | $2,445.12 | | |
| | 00894377885 | XXL | 288 | $5.66 | $1,630.08 | | |
| | | | 1,728 | | $9,780.48 | | |
| City | Ticket UPC | Size | | | | | |
| Las Vegas (19) | 00894377892 | S | 576 | $5.66 | $3,260.16 | | |
| | 00894377908 | M | 1,224 | $5.66 | $6,927.84 | | |
| | 00894377915 | L | 2,376 | $5.66 | $13,448.16 | | |

# Domestic Vendor



6100 Old Park Lane
PH 407-445-76

Florida
FX 407-445-7770

**Vendor:** Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

**Ship To:** Giant Merchandising
8457 Eastern Ave. # A

Bell Gardens
Caifornia
90201
US
323-887-3300

| PO Number | GM-000922 |
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

**Hard Rock UPC**
**Las Vegas (19)**

| Vendor UPC | Description | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437922 | XL | 1,800 | $5.66 | $10,188.00 |
| 00893437939 | XXL | 1,224 | $5.66 | $6,927.84 |
| | | 7,200 | | $40,752.00 |

**City**
**Maui (30)**

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437946 | S | 144 | $5.66 | $815.04 |
| 00893437953 | M | 288 | $5.66 | $1,630.08 |
| 00893437960 | L | 576 | $5.66 | $3,260.16 |
| 00893437977 | XL | 432 | $5.66 | $2,445.12 |
| 00893437984 | XXL | 288 | $5.66 | $1,630.08 |
| | | 1,728 | | $9,780.48 |

**City**
**Newport Beach (22)**

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437240 | S | 72 | $5.66 | $407.52 |
| 00893437257 | M | 144 | $5.66 | $815.04 |
| 00893437264 | L | 288 | $5.66 | $1,630.08 |
| 00893437271 | XL | 216 | $5.66 | $1,222.56 |
| 00893437288 | XXL | 144 | $5.66 | $815.04 |
| | | 864 | | $4,890.24 |

**City**
**Phoenix (24)**

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893438493 | S | 144 | $5.66 | $815.04 |
| 00893438509 | M | 288 | $5.66 | $1,630.08 |
| 00893438516 | L | 576 | $5.66 | $3,260.16 |
| 00893438523 | XL | 432 | $5.66 | $2,445.12 |
| 00893438530 | XXL | 288 | $5.66 | $1,630.08 |
| | | 1,728 | | $9,780.48 |

**City**

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|

Page

# Hard Rock CAFE

6100 Old Park Lane     Florida
PH 407-445-76          FX 407-445-7770

Vendor: Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

## Domestic Vendor

| | |
|---|---|
| PO Number | GM-000922 |
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

Ship To: Giant Merchandising
8457 Eastern Ave. # A

Bell Gardens
Caifornia
90201
US
323-887-3300

**Hard Rock UPC** — Sacramento (34)

| Vendor UPC | Description | Quantity | Unit Cost | Total | U/M | Order Qty | Total Cost |
|---|---|---|---|---|---|---|---|
| 00893437854 7 | S | 72 | $5.66 | $407.52 | | | |
| 00893437855 4 | M | 144 | $5.66 | $815.04 | | | |
| 00893437856 1 | L | 288 | $5.66 | $1,630.08 | | | |
| 00893437857 8 | XL | 216 | $5.66 | $1,222.56 | | | |
| 00893437858 5 | XXL | 144 | $5.66 | $815.04 | | | |
| | | 864 | | $4,890.24 | | | |

**City** — San Diego (23)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437859 2 | S | 72 | $5.66 | $407.52 |
| 00893437860 8 | M | 144 | $5.66 | $815.04 |
| 00893437861 5 | L | 288 | $5.66 | $1,630.08 |
| 00893437862 2 | XL | 216 | $5.66 | $1,222.56 |
| 00893437863 9 | XXL | 144 | $5.66 | $815.04 |
| | | 864 | | $4,890.24 |

**City** — San Francisco (28)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437864 6 | S | 144 | $5.66 | $815.04 |
| 00893437865 3 | M | 288 | $5.66 | $1,630.08 |
| 00893437866 0 | L | 576 | $5.66 | $3,260.16 |
| 00893437867 7 | XL | 432 | $5.66 | $2,445.12 |
| 00893437868 4 | XXL | 288 | $5.66 | $1,630.08 |
| | | 1,728 | | $9,780.48 |

**City** — Salt Lake City (38)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437874 5 | S | 72 | $5.66 | $407.52 |
| 00893437875 2 | M | 144 | $5.66 | $815.04 |
| 00893437876 9 | L | 216 | $5.66 | $1,222.56 |
| 00893437877 6 | XL | 144 | $5.66 | $815.04 |
| 00893437878 3 | XXL | 72 | $5.66 | $407.52 |

Case 6:01-cv-00790-GKS-DAB   Document 1   Filed 07/02/01   Page 51 of 60 PageID 51



Hard Rock CAFE

6100 Old Park Lane
PH 407-445-76     Florida
                  FX 407-445-7770

Vendor:  Sunrise Clothing Group
         14051 NE 200th Street

         Woodinville
         WA
         98072
         US
         800-424-9272

Domestic Vendor

| PO Number | GM-000922 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

Ship To:  Giant Merchandising
          8457 Eastern Ave. # A

          Bell Gardens
          Cafiornia
          90201
          US
          323-887-3300

Hard Rock UPC        Vendor UPC        Description

| City | Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|---|
| San Antonio (10) | 008934378790 | S | 288 | $5.66 | $1,630.08 |
| | 008934378806 | M | 576 | $5.66 | $3,260.16 |
| | 008934378813 | L | 1,224 | $5.66 | $6,927.84 |
| | 008934378820 | XL | 936 | $5.66 | $5,297.76 |
| | 008934378837 | XXL | 576 | $5.66 | $3,260.16 |
| | | | 3,600 | | $20,376.00 |

Total Units Ordered For Garment Dyed Tee-Green        37,440        $211,910.40

U/M        Order Qty

Total Cost        $3,667.68

648

Page

# Domestic Vendor

**Hard Rock CAFE**

6100 Old Park Lane
PH 407-445-76

Florida
FX 407-445-7770

**Vendor:** Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

| PO Number | GM-000922 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

**Ship To:** Giant Merchandising
8457 Eastern Ave. # A

Bell Gardens
Caifornia
90201
US
323-887-3300

| Hard Rock UPC | Vendor UPC | Description | | | U/M | Order Qty |
|---|---|---|---|---|---|---|

| | | | | | PO Total | |
|---|---|---|---|---|---|---|
| TOTALS | | | Units | 37,440 | | Total Cost |
| | | | | | | $211,910.20 |

*Jeaumaire Miller*

Approved

**Additional Instructions**
PLEASE REFER TO HRC SHIPPING/ROUTING GUIDE

# Domestic Vendor

**Hard Rock Cafe**

| Vendor: | Sunrise Clothing Group | | |
|---|---|---|---|
| | 14051 NE 200th Street | | |

6100 Old Park Lane
PH 407-445-76   Florida   FX 407-445-7770

Woodinville
WA
98072
US
800-424-9272

FAXED 1/3/00

| PO Number | SSD-000923 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

**Ship To:** SS Designs - Hard Rock Cafe
65 Industrial Circle
Winter Haven
FL
33880
US
941-967-1496

| U/M | EACH |
|---|---|
| Order Qty | 59,400 |
| Total Cost | $336,204.00 |

**Description:** Garment Dyed Tee-Green

**Vendor UPC**
**Hard Rock UPC** 008934376888

### City — Atlantic City (18)

| Size | Ticket UPC | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| S | 00894376949 | 72 | $5.66 | $407.52 |
| M | 00894376956 | 432 | 5.66 | 2,445.12 |
| L | 00894376963 | 288 | 5.66 | 1,630.08 |
| XL | 00894376970 | 216 | 5.66 | 1,222.56 |
| XXL | 008934376987 | 216 | 5.66 | 1,222.56 |
| | | 1,224 | | $6,927.84 |

### City — Atlanta (06)

| Size | Ticket UPC | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| S | 00894376994 | 216 | $5.66 | $1,222.56 |
| M | 00894377007 | 432 | 5.66 | 2,445.12 |
| L | 00894377014 | 792 | 5.66 | 4,482.72 |
| XL | 00894377021 | 576 | 5.66 | 3,260.16 |
| XXL | 00894377038 | 432 | 5.66 | 2,445.12 |
| | | 2,448 | | $13,855.68 |

### City — Baltimore (32)

| Size | Ticket UPC | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| S | 00894377045 | 144 | $5.66 | $815.04 |
| M | 00894377052 | 288 | 5.66 | 1,630.08 |
| L | 00894377069 | 576 | 5.66 | 3,260.16 |
| XL | 00894377076 | 432 | 5.66 | 2,445.12 |
| XXL | 00894377083 | 288 | 5.66 | 1,630.08 |
| | | 1,728 | | $9,780.48 |

### City — Boston (12)

| Size | Ticket UPC | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| S | 00894377090 | 144 | $5.66 | $815.04 |
| M | 00894377106 | 288 | 5.66 | 1,630.08 |

Page

Page

# Domestic Vendor

**Hard Rock Cafe**
CAFE

6100 Old Park Lane          Florida
PH 407-445-76               FX 407-445-7770

Vendor: Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

| PO Number | SSD-000923 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

Ship To: SS Designs - Hard Rock Cafe
65 Industrial Circle

Winter Haven
FL
33880
US
941-967-1496

**Hard Rock UPC**

| | Vendor UPC | Description | Quantity | Unit Cost | Total | U/M | Order Qty | Total Cost |
|---|---|---|---|---|---|---|---|---|
| Boston (12) | 00893437113 | L | 576 | $5.66 | $3,260.16 | | | |
| | 00893437120 | XL | 432 | $5.66 | $2,445.12 | | | |
| | 00893437137 | XXL | 288 | $5.66 | $1,630.08 | | | |
| | | | 1,728 | | $9,780.48 | | | |

| City | Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|---|
| Chicago (29) | 00893437144 | S | 216 | $5.66 | $1,222.56 |
| | 00893437151 | M | 432 | $5.66 | $2,445.12 |
| | 00893437168 | L | 792 | $5.66 | $4,482.72 |
| | 00893437175 | XL | 576 | $5.66 | $3,260.16 |
| | 00893437182 | XXL | 432 | $5.66 | $2,445.12 |
| | | | 2,448 | | $13,855.68 |

| City | Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|---|
| Cleveland (39) | 00893437199 | S | 144 | $5.66 | $815.04 |
| | 00893437205 | M | 288 | $5.66 | $1,630.08 |
| | 00893437212 | L | 576 | $5.66 | $3,260.16 |
| | 00893437229 | XL | 432 | $5.66 | $2,445.12 |
| | 00893437236 | XXL | 288 | $5.66 | $1,630.08 |
| | | | 1,728 | | $9,780.48 |

| City | Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|---|
| Ft. Lauderdale (46) | 00893437342 | S | 72 | $5.66 | $407.52 |
| | 00893437359 | M | 144 | $5.66 | $815.04 |
| | 00893437366 | L | 288 | $5.66 | $1,630.08 |
| | 00893437373 | XL | 216 | $5.66 | $1,222.56 |
| | 00893437380 | XXL | 144 | $5.66 | $815.04 |
| | | | 864 | | $4,890.24 |

# Hard Rock Cafe

## Domestic Vendor

6100 Old Park Lane  
PH 407-445-76  
Florida  
FX 407-445-7770

**Vendor:** Sunrise Clothing Group  
14051 NE 200th Street  
Woodinville  
WA  
98072  
US  
800-424-9272

| PO Number | SSD-000923 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

**Ship To:** SS Designs - Hard Rock Cafe  
65 Industrial Circle  

Winter Haven  
FL  
33880  
US  
941-967-1496

| Hard Rock UPC | Vendor UPC — Ticket UPC | Description — Size | Quantity | Unit Cost | Total | U/M | Order Qty | Total Cost |
|---|---|---|---|---|---|---|---|---|
| **City** Gatlinburg (47) | 00893437397 | S | 216 | $5.66 | $1,222.56 | | | |
| | 00893437403 | M | 432 | $5.66 | $2,445.12 | | | |
| | 00893437410 | L | 792 | $5.66 | $4,482.72 | | | |
| | 00893437427 | XL | 576 | $5.66 | $3,260.16 | | | |
| | 00893437434 | XXL | 432 | $5.66 | $2,445.12 | | | |
| | | | **2,448** | | **Total $13,855.68** | | | |
| **City** Indianapolis (45) | 00893437595 | S | 144 | $5.66 | $815.04 | | | |
| | 00893437601 | M | 288 | $5.66 | $1,630.08 | | | |
| | 00893437618 | L | 576 | $5.66 | $3,260.16 | | | |
| | 00893437625 | XL | 432 | $5.66 | $2,445.12 | | | |
| | 00893437632 | XXL | 288 | $5.66 | $1,630.08 | | | |
| | | | **1,728** | | **Total $9,780.48** | | | |
| **City** Key West (16) | 00893437649 | S | 72 | $5.66 | $407.52 | | | |
| | 00893437656 | M | 216 | $5.66 | $1,222.56 | | | |
| | 00893437663 | L | 432 | $5.66 | $2,445.12 | | | |
| | 00893437670 | XL | 288 | $5.66 | $1,630.08 | | | |
| | 00893437687 | XXL | 216 | $5.66 | $1,222.56 | | | |
| | | | **1,224** | | **Total $6,927.84** | | | |
| **City** Miami (07) | 00893437991 | S | 72 | $5.66 | $407.52 | | | |
| | 00893438004 | M | 216 | $5.66 | $1,222.56 | | | |
| | 00893438011 | L | 432 | $5.66 | $2,445.12 | | | |

# Domestic Vendor

6100 Old Park Lane
PH 407-445-76
Florida
FX 407-445-7770

**Vendor:** Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

| PO Number | SSD-000923 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

**Ship To:** SS Designs - Hard Rock Cafe
65 Industrial Circle

Winter Haven
FL
33880
US
941-967-1496

Order Qty   U/M   Total Cost

**Hard Rock UPC**
**Miami (07)**

| Vendor UPC | Description | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00894378028 | XL | 288 | $5.66 | $1,630.08 |
| 00894378035 | XXL | 216 | $5.66 | $1,222.56 |
| | | 1,224 | | $6,927.84 |

**City Memphis (36)**

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00894378042 | S | 144 | $5.66 | $815.04 |
| 00894378059 | M | 288 | $5.66 | $1,630.08 |
| 00894378066 | L | 576 | $5.66 | $3,260.16 |
| 00894378073 | XL | 432 | $5.66 | $2,445.12 |
| 00894378080 | XXL | 288 | $5.66 | $1,630.08 |
| | | 1,728 | | $9,780.48 |

**City Myrtle Beach (04)**

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00894378097 | S | 576 | $5.66 | $3,260.16 |
| 00894378103 | M | 1,224 | $5.66 | $6,927.84 |
| 00894378110 | L | 2,376 | $5.66 | $13,448.16 |
| 00894378127 | XL | 1,800 | $5.66 | $10,188.00 |
| 00894378134 | XXL | 1,224 | $5.66 | $6,927.84 |
| | | 7,200 | | $40,752.00 |

**City Niagara Falls (17)**

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00894378141 | S | 144 | $5.66 | $815.04 |
| 00894378158 | M | 288 | $5.66 | $1,630.08 |
| 00894378165 | L | 576 | $5.66 | $3,260.16 |
| 00894378172 | XL | 432 | $5.66 | $2,445.12 |
| 00894378189 | XXL | 288 | $5.66 | $1,630.08 |
| | | 1,728 | | $9,780.48 |

**City**

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|

Page

# Domestic Vendor

Hard Rock Cafe

6100 Old Park Lane    Florida
PH 407-445-76        FX 407-445-7770

Vendor: Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

| | |
|---|---|
| PO Number | SSD-000923 |
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

Ship To: SS Designs - Hard Rock Cafe
65 Industrial Circle

Winter Haven
FL
33880
US
941-967-1496

**Hard Rock UPC**
**New Orleans (26)**

| Vendor UPC | Description | Quantity | Unit Cost | Total | U/M | Order Qty | Total Cost |
|---|---|---|---|---|---|---|---|
| 00893437819 6 | S | 144 | $5.66 | $815.04 | | | |
| 00893437820 2 | M | 288 | $5.66 | $1,630.08 | | | |
| 00893437821 9 | L | 576 | $5.66 | $3,260.16 | | | |
| 00893437822 6 | XL | 432 | $5.66 | $2,445.12 | | | |
| 00893437823 3 | XXL | 288 | $5.66 | $1,630.08 | | | |
| | | 1,728 | | $9,780.48 | | | |

City
Nashville (09)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437829 5 | S | 144 | $5.66 | $815.04 |
| 00893437830 1 | M | 288 | $5.66 | $1,630.08 |
| 00893437831 8 | L | 576 | $5.66 | $3,260.16 |
| 00893437832 5 | XL | 432 | $5.66 | $2,445.12 |
| 00893437833 2 | XXL | 288 | $5.66 | $1,630.08 |
| | | 1,728 | | $9,780.48 |

City
New York (11)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437834 9 | S | 576 | $5.66 | $3,260.16 |
| 00893437835 6 | M | 1,224 | $5.66 | $6,927.84 |
| 00893437836 3 | L | 2,376 | $5.66 | $13,448.16 |
| 00893437837 0 | XL | 1,800 | $5.66 | $10,188.00 |
| 00893437838 7 | XXL | 1,224 | $5.66 | $6,927.84 |
| | | 7,200 | | $40,752.00 |

City
Orlando (15)

| Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| 00893437839 4 | S | 576 | $5.66 | $3,260.16 |
| 00893437840 0 | M | 1,224 | $5.66 | $6,927.84 |
| 00893437841 7 | L | 2,376 | $5.66 | $13,448.16 |
| 00893437842 4 | XL | 1,800 | $5.66 | $10,188.00 |
| 00893437843 1 | XXL | 1,224 | $5.66 | $6,927.84 |

# Domestic Vendor



**Hard Rock Cafe**
6100 Old Park Lane
PH 407-445-76   Florida   FX 407-445-7770

**Vendor:** Sunrise Clothing Group
14051 NE 200th Street
Woodinville
WA
98072
US
800-424-9272

**Ship To:** SS Designs - Hard Rock Cafe
65 Industrial Circle
Winter Haven
FL
33880
US
941-967-1496

| PO Number | SSD-000923 |
|---|---|
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

**Total Order Qty** 7,200   **Total** $40,752.00

**Hard Rock UPC**    **Vendor UPC**    **Description**    **U/M**    **Order Qty**

| City | Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|---|
| Philadelphia (33) | 00893437848 | S | 72 | $5.66 | $407.52 |
| | 00893437855 | M | 216 | $5.66 | $1,222.56 |
| | 00893437862 | L | 432 | $5.66 | $2,445.12 |
| | 00893437879 | XL | 288 | $5.66 | $1,630.08 |
| | 00893437886 | XXL | 216 | $5.66 | $1,222.56 |
| | | | 1,224 | | $6,927.84 |
| San Juan (08) | 00893437691 | S | 72 | $5.66 | $407.52 |
| | 00893437707 | M | 216 | $5.66 | $1,222.56 |
| | 00893437714 | L | 432 | $5.66 | $2,445.12 |
| | 00893437721 | XL | 288 | $5.66 | $1,630.08 |
| | 00893437738 | XXL | 216 | $5.66 | $1,222.56 |
| | | | 1,224 | | $6,927.84 |
| St. Louis (40) | 00893437844 | S | 72 | $5.66 | $407.52 |
| | 00893437851 | M | 216 | $5.66 | $1,222.56 |
| | 00893437868 | L | 432 | $5.66 | $2,445.12 |
| | 00893437875 | XL | 288 | $5.66 | $1,630.08 |
| | 00893437882 | XXL | 216 | $5.66 | $1,222.56 |
| | | | 1,224 | | $6,927.84 |
| St. Thomas (05) | 00893437899 | S | 72 | $5.66 | $407.52 |
| | 00893437905 | M | 216 | $5.66 | $1,222.56 |

Page

# Domestic Vendor

**Hard Rock CAFE**

6100 Old Park Lane        Florida
PH 407-445-76             FX 407-445-7770

Vendor: Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

| | |
|---|---|
| PO Number | SSD-000923 |
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

Ship To: SS Designs - Hard Rock Cafe
65 Industrial Circle

Winter Haven
FL
33880
US
941-967-1496

| Hard Rock UPC | Vendor UPC | Description | Quantity | Unit Cost | Total | U/M | Order Qty |
|---|---|---|---|---|---|---|---|
| St. Thomas (05) | | | | | | | |
| | 00893437912 | L | 432 | $5.66 | $2,445.12 | | |
| | 00893437929 | XL | 288 | $5.66 | $1,630.08 | | |
| | 00893437936 | XXL | 216 | $5.66 | $1,222.56 | | |
| | | | 1,224 | | $6,927.84 | | |

| City | Ticket UPC | Size | Quantity | Unit Cost | Total |
|---|---|---|---|---|---|
| Washington D.C. (14) | | | | | |
| | 00893437943 | S | 576 | $5.66 | $3,260.16 |
| | 00893437950 | M | 1,224 | $5.66 | $6,927.84 |
| | 00893437967 | L | 2,376 | $5.66 | $13,448.16 |
| | 00893437974 | XL | 1,800 | $5.66 | $10,188.00 |
| | 00893437981 | XXL | 1,224 | $5.66 | $6,927.84 |
| | | | 7,200 | | $40,752.00 |

Total Units Ordered For Garment Dyed Tee-Green    59,400    $336,204.00

# Domestic Vendor

Page _____

6100 Old Park Lane
PH 407-445-76    Florida
FX 407-445-7770

Vendor:   Sunrise Clothing Group
14051 NE 200th Street

Woodinville
WA
98072
US
800-424-9272

| PO Number | SSD-000923 |
| --- | --- |
| Order Date | 12-29-1999 |
| Do Not Ship Before | 04-15-2000 |
| Do Not Ship After | 05-01-2000 |
| Cancel After Date | 05-01-2000 |
| Ship Via | |
| Terms | Net 30 |

Ship To:   SS Designs - Hard Rock Cafe
65 Industrial Circle

Winter Haven
FL
33880
US
941-967-1496

| Hard Rock UPC | Vendor UPC | Description | U/M | Order Qty | Total Cost |
| --- | --- | --- | --- | --- | --- |

| | Units | PO Total | | | |
| --- | --- | --- | --- | --- | --- |
| TOTALS | 59,400 | | | | $336,204.0 |

Approved

_Jean-marie Miele_

Additional Instructions
PLEASE REFER TO HRC SHIPPING/ROUTING GUIDE